# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

KIM MARX,

     Plaintiff,

v.                               Case No. 3:16-cv-462-J-32MCR

BAKER COUNTY MEDICAL
SERVICES, INC. and DENNIS
MARKOS,

     Defendants.

_____

# **O R D E R**

     This Employment Retirement Income Security Act ("ERISA") and Family and Medical Leave Act ("FMLA") retaliation case is before the Court on Defendants Baker County Medical Services, Inc. ("BCMS") and Dennis Markos's Dispositive Motion for Summary Judgment. (Doc. 33). Plaintiff Kim Marx filed a response.[1] (Doc. 34). With the Court's permission (Doc. 37), Defendants filed a reply (Doc. 38), and Marx filed a sur-reply (Doc. 39).

---

     [1] Marx's response is full of typos, grammatical errors, and phrases which do not make sense. At one point, he uses names from another case, demonstrating that counsel recycled the brief. <u>See</u> Doc. 34 at 18 ("unlawful animus motivated Lemon's actions toward Andre"); Doc. 34 at 20 ("any review of Lemon's decisions existed"). In short, this work does not meet the standards of professional practice expected in this Court.

## I.    BACKGROUND

### A.    Marx's History with BCMS

BCMS is a twenty-five bed, not-for-profit hospital in Baker County, Florida, where Markos served as chief executive officer between 1994 and January 3, 2017. (Doc. 33 at 3; Doc. 33-10, Markos Dep. 6:20-7:18, 10:6-10, 40:24-41:3).[2] From May 2008 until his termination on April 12, 2013, Marx worked at BCMS as director of the respiratory department and sleep lab.[3] (Doc. 33-14, Marx Dep. 87:7-19). Markos hired Marx and was his supervisor.

According to BCMS's Human Resources Director, Stacey Conner, BCMS has a progressive discipline policy, whereby discipline may be verbal or written, or result in suspension or termination. (Doc. 34-10, Conner Dep. 8:24-9:2, 46:5-48:16). Based on the severity of an employee's infraction, the hospital would reserve the right to skip steps of progressive discipline and go directly to termination. (Conner Dep. 48:13-16). For instance, an action that resulted in patient injury, or had a detrimental effect on the organization or its employees, could be considered serious enough to discharge an employee—even for a first offense. (Markos Dep. 94:2-4, 139:1-9; Doc. 33-11, V. Markos Dep. 89:22-90:19).

---

[2] The Court will refer to Dennis Markos as "Markos" and to Valerie Markos as "Ms. Markos" or "V. Markos." Similarly, the Court will refer to Kim Marx as "Marx" and to Debora Marx as "Ms. Marx" or "D. Marx."

[3] Marx states in his deposition that he was terminated on April 18, 2013. (Marx. Dep. 210:18-19).

During his tenure with BCMS, Marx received positive performance reviews and had no formal written disciplinary action or other adverse actions taken against him prior to his termination. (Markos Dep. 108:12-15; Marx Dep. 92:8-95:5).

BCMS provides health benefits to its employees under the Employee Health Benefits Plan (the "Plan"), which is partially self-funded from a monthly premium paid by employees. (Markos Dep. 21:4-22:15). In addition, BCMS purchases stop-gap insurance to protect against extraordinary expenses. Under this insurance, BCMS pays the first $60,000 of a claim, after which the insurance is responsible. (Markos Dep. 14:14-15:11). During the time period at issue, a third party administrator ("TPA"), Preferred Benefit Administrators, Inc. managed the daily activities of the Plan and submitted a weekly funding request based on its claims administration for the week. (Markos Dep. 23:1-4, 34:4-9). The hospital's controller and chief financial officer reviewed and approved the weekly funding request, without input from Markos. (Markos Dep. 32:8-16; Doc. 33-12, Martin Dep. 31:20-32:17).

Both Marx and his wife, Debora Marx, were covered participants under the Plan while Marx worked at BCMS. (Marx Dep. 52:19-53:1). During his employment, Marx underwent numerous medical procedures covered by the Plan, including a microwave transurethral resection in 2008 (Marx Dep. 129:11-20), arthroscopic knee operations in 2010 (Marx Dep. 88:11-22), ACDF neck cervical surgery in 2011 (Marx Dep. 89:18-24), and a cardiac catheterization

procedure in 2012 (Marx Dep. 119:1-14), among others (see Doc. 33 at 6). Ms. Marx, too, had several procedures covered by the Plan, including a laminectomy in 2011 (Marx. Dep. 90:6-12; Doc. 33-13, D. Marx Dep. 28:14-21), hand surgery resulting from a slip and fall in 2011 (Marx Dep. 90:24-91:4; D. Marx Dep. 28:25-29:4), and a gallbladder removal in 2012 (D. Marx Dep. 26:7-11), among other procedures like endoscopies and colonoscopies (D. Marx Dep. 26:12-13, 28:9-11). Ms. Marx testified that, other than some issues related to her slip and fall, discussed below, there were never any problems concerning payment of these expenses. (D. Marx Dep. 38:7-21). And, even after some controversy, the bill related to her slip and fall was also paid in full. (D. Marx Dep. 38:22-39:4). During Marx's time at BCMS, the TPA never submitted a bill to BCMS where someone determined that it should not be paid, (Markos Dep. 34:10-14, 59:20-24; Marx Dep. 249:3-250:4), and Markos approved every leave request in his thirty-eight years of administration (Markos Dep. 88:1-2). Further, Markos was aware of the Marxes' surgeries over the years. (Markos Dep. 67:21-68:6). Markos also knew Marx had knee ailments which would eventually require surgery. (Markos Dep. 68:7-69:22, 82:13-85:20).

    In 2011, on the same day as Marx's neck surgery, Ms. Marx slipped and fell in the parking garage at St. Vincent's Hospital. (D. Marx Dep. 31:4-6). She injured herself, requiring hand surgery. (D. Marx Dep. 31:7-16). Marx was concerned that Ms. Marx's accident was at least partly St. Vincent's

responsibility, so he spoke to Derek Merrill, the risk manager for St. Vincent's. (Marx. Dep. 69:7-15). Marx thought St. Vincent's liability should be determined before BCMS paid Ms. Marx's bill, so Marx also relayed his concern to Markos and Tricia Martin, BCMS's controller from June 2008 to January 2017 and later its chief financial officer until October 2017. (Marx Dep. 74:9-16, 77:13-19; Markos Dep. 74:1-4; Martin Dep. 7:10-19, 40:9-25). After hearing about Marx's concerns, Markos directed Martin to tell the TPA not to pay the claims regarding Ms. Marx's bill, which Martin stated was the only time Markos instructed her not to pay a claim.[4] (Martin Dep. 41:3-17). At some point, Marx went to Markos's office to discuss payment of his wife's bill and testified that Markos called him a "thief," said "you're stealing my money," and told him to "get out of his office." (Marx Dep. 96:1-19). The Marxes' apparent lack of "effort" to determine whether they had a case against St. Vincent's angered Markos and prompted him to coordinate a call with BCMS's corporate counsel and Marx to discuss the issue. (Markos Dep. 74:4-20). Ultimately, Merrill investigated but

---

[4] Markos's and Martin's deposition testimony on this point is a bit confusing. Markos states that he did not tell Martin not to pay the claim, but what he seems to be saying is that he did not unilaterally decide not to pay it. Instead, only after Marx told him St. Vincent's might be responsible in some way, did Markos tell Martin not to pay the bill.

Martin, too, testified that Marx came to her and said he thought St. Vincent's might be responsible for the bill. However, she testified that Markos told her not to pay the bill, which is slightly different than Markos's account, but the overall gist of their testimony is the same.

found no reason to believe St. Vincent's was responsible. (Marx. Dep. 72:12-23). Although BCMS delayed paying Ms. Marx's claim pending a decision regarding St. Vincent's responsibility and whether the Marxes would sue St. Vincent's, ultimately, BCMS paid the claim under the Plan. (Marx. Dep. 85:12-13). Marx believed that, although he was not subjected to any adverse action or discipline, the issues related to his wife's bill "affected" his relationship with Markos. (Marx. Dep. 94:12-24).

## B. BCMS's Electronic Health Records Conversion

In 2012, BCMS undertook a conversion of its electronic health records to a new system and selected the vendor Meditech to implement the project. (Markos Dep. 97:5-98:2). BCMS's information technology director, Earnest Waller, was in charge of the transition. (Markos Dep. 131:12-13). The project was to be implemented "very fast" and in two phases, with the goal of meeting critical government deadlines so that BCMS could obtain Centers for Medicare and Medicaid Services' meaningful use reimbursement. (V. Markos Dep. 13:19-25, 15:4-23; Marx Dep. 162:4-11). The reimbursement was worth approximately $1.25 million. (Doc. 33-6, CMMS Status Information Regarding EHR Reimbursement; Markos Dep. 112:7-19). The go-live deadline for Phase I was April 1, 2013. (Doc. 33-16, Waller Dep. 197:16-20, 228:20-22). Each department head at BCMS was told of the time-sensitive nature of the project and was responsible for the Meditech module in his department, including building

directories and dictionaries, and ensuring compatibility with the other systems at the hospital.[5] (Markos Dep. 109:5-13; Marx Dep. 164:7-16).

Marx was in charge of the respiratory department and chose Diane Sweat, a sleep lab employee with clerical skills but no experience with the Meditech software, to assist him with the conversion process. (Marx Dep. 177:16-180:10). Marx attended Meditech training sessions in Boston at least four times. (Marx Dep. 199:7-8). Although Meditech recommended Imaging and Therapeutic Services ("ITS") software for the respiratory department, Marx disagreed with the recommendation because he thought it was not appropriate for his department's needs. Instead, he told Waller he believed the OM and PCS modules would work better, and Waller accepted Marx's judgment because, as its leader, Marx was most knowledgeable about the respiratory department. (Waller Dep. 279:2-281:2). In addition to Sweat, Ms. Markos and the nursing staff assisted Marx in building the directories in OM. (Marx Dep. 197:25-198:6; V. Markos Dep. 88:2-9).

---

[5] Valerie Markos, Director of Nursing at BCMS, described the "building" of the system (often referred to as dictionaries or directories in the case) as entering documentation for the nursing staff and the physicians, with the goal of having all of the information in the electronic system in a form that reflected a chart like a paper chart. (V. Markos Dep. 18:7-22). Marx was responsible for inputting codes for supplies or billing in Order Management ("OM"), and was supposed to build information that would permit the system to receive information in the medical record, Patient Care Services ("PCS"), and billing. (V. Markos Dep. 51: 2-14).

Markos testified that he received reports that Marx had a negative attitude about the Meditech project from the beginning. (Markos Dep. 109:24-110:24, 112:1-6; V. Markos Dep 83:13-19). Marx had an admittedly difficult time, stating that he did not have the resources, talent, knowledge, or support to properly implement the conversion in his department. (Marx Dep. 177:7-15; V. Markos Dep. 86:25-88:9, 97:12-24). Ms. Markos characterized Marx's attitude at Meditech's ITS training as "negative" and "unwilling to continue the training and learn what was necessary and ask the proper questions for his department." (V. Markos Dep. 83:7-19). In addition, Sweat and respiratory employees Dell Lee and Nikki Harvey notified Waller that they did not feel prepared for the go-live deadline. (Lee Dec., Doc. 33-8 ¶ 3; Waller Dep. 362:13-364:22, 373:1-7, 383:14-23). Sweat, Harvey, Elizabeth Gray, and Lee also complained to Marx about the conversion. (Marx Dep. 203:13-204:9, 213:1-12).

Although at various core team meetings Marx stated that things were "great" in the respiratory department, (Martin Dep. 92:3-94:11), Marx belatedly realized that OM and PCS were not suited for the respiratory department's needs because those systems could not automatically advise staff that an order for respiratory work had been placed, (Marx Dep. 173:22-175:5). Thus, he met with Waller and Ms. Markos in March 2013 to address this issue, resulting in a decision to use the ITS module originally recommended by Meditech. (Marx. Dep. 175:5). On March 30-31, 2013, Marx wrote the ITS dictionaries in

anticipation of the April 1, 2013 go-live date for Phase I. (Marx Dep. 176:8-177:2).

Long before and during the Meditech conversion, Marx had discussed his knee ailments with Markos many times, including several times in the year prior to his termination. (Doc. 34-2, Marx Aff. ¶ 12; Markos Dep. 68:7-69:22, 80:25-81:23). Approximately two weeks prior to his termination and after the Phase I deadline, Marx met with Markos and told him that he required knee surgery and asked for leave to obtain treatment.[6] (Marx Dep. 149:8-16). Markos said he would "look into it and let [him] know in two weeks." (Marx Dep. 150:1-18). In the interim between Marx's conversation with Markos and his termination, Marx was "trying to get the lab up and running," (Marx. Dep. 213:13-214:7), but did not do more work on the ITS system.

Despite Marx's efforts at the end of March 2013 to build the ITS system, there were equipment and software issues remaining in the respiratory department before the Phase I deadline, such as problems with a blood gas technological interface, and charges not dropping into the billing system. (Waller Dep. 229:10-17). Thus, according to Waller, the respiratory department

---

[6] Marx states in his deposition that he met with Markos on April 7 or 8, 2013. (Marx. Dep. 150:22-24, 210:5-11). The precise date of Marx's meeting with Markos is unclear.

was not ready on the go-live date. (Waller Dep. 240:1-246:25; V. Markos Dep. 65:12-15, 66:18-67:24).

Waller viewed Marx as the reason the system was not working properly "in that [Marx] did not meet the deadlines on certain things and [made] decisions right at the last minute." (Waller Dep. 281:11-17). He spoke with Markos about Marx's progress on the Meditech project periodically, at least half a dozen times. (Markos Dep. 139:10-19, 147:13-148:16). On April 10, 2013, Waller spoke to Markos about his dissatisfaction with Marx's performance on the project after the April 1, 2013 Phase I go-live date. (Waller Dep. 282:16-284:6, 372:9-17). After their meeting that day, Waller memorialized his concerns in a memorandum to Markos. (Waller Memo., Doc. 33-7 at 4-5). Waller opined that Marx should not stay in charge of the Phase II implementation, as it would lead to the "same result" and "the final depletion of any morale left within his staff." (Doc. 33-7 at 5, Waller Memo.). In addition, Markos asked other BCMS employees for their input on the issues that led to Marx's discharge, and after receiving it, asked them to memorialize their statements in writing. (Markos Dep. 125:7-18, 127:10-16; Doc. 33-7, Markos Dec. at 12-15).

On April 12, 2013, Marx was called to Markos's office, where he met with Markos and Conner. (Marx. Dep. 214:8-215:5). At that meeting, Markos terminated Marx. (Markos Dep. 12:23-13:1, 124:2-17, 152:1-25). Markos testified that he terminated Marx for his failure to timely implement the

Meditech software in the respiratory department and his "obstructionistic, negative" approach to the "mission critical" project. (Markos Dep. 114:1-115:3, 125:4-126:9, 155:13-19, 161:10-25). Specifically, Markos noted the "severe" complaints against Marx being unwilling to do his job and get the respiratory department's conversion completed, that the Meditech project was approaching the meaningful use deadline, and that Marx was going to cost the hospital approximately $1 million if the timeline was not met. (Markos Dep. 111:19-112:19). Marx's failure to complete an assignment which would cost BCMS $1 million fell within the personnel policy of "detrimental to the organization," allowing Markos to terminate him for a first time offense. (Markos Dep. 133:10-17, 139:4-9). Marx testified that at the termination meeting, Markos stated that there "were problems in [the respiratory] department and we have had problems with your [Marx's] computer; you need to leave now," (Marx Dep. 253:1-7), though Marx states that he did not know what Markos was talking about, as they did not have a discussion about his termination, (Marx Dep. 233:7-14, 253:8-16). Markos testified that at the termination meeting, he indicated that Marx was not performing up to his expected level and made a remark about the computer system. (Markos Dep. 152: 11-19). Markos permitted Marx to fill a prescription at the BCMS pharmacy before leaving the premises. (Markos Dep. 152:22-25).

On December 13, 2013, Marx sent Markos an email entitled "Best wishes for the new year":

> Sorry we had to end things as we did after 5 years. I have had a long time to think about my over-enthusiasm and lack of computer skills. But regardless Lets [sic] hope 2014 will be a great year for all of us. My best to Val.
>
> Kim Marx

(Doc. 33-7 at 16).

On April 18, 2016, Marx filed a two-count complaint alleging a violation of Section 510 of ERISA (Count I) and unlawful retaliation and violation of the FMLA, 29 U.S.C. § 2601 et seq. (Count II) (Doc. 1).

## II.     STANDARD OF REVIEW

Summary judgment is proper where "there is no genuine issue as to any material fact" and "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "The burden of demonstrating the satisfaction of this standard lies with the movant, who must present pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, that establish the absence of any genuine material, factual dispute." Branche v. Airtran Airways, Inc., 342 F.3d 1248, 1252-53 (11th Cir. 2003) (internal quotations omitted). An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the non-movant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986).

12

In determining whether summary judgment is appropriate, a court must draw inferences from the evidence in the light most favorable to the non-movant and resolve all reasonable doubts in that party's favor. See Centurion Air Cargo, Inc. v. United Parcel Serv. Co., 420 F.3d 1146, 1149 (11th Cir. 2005). However, "Rule 56 mandates the entry of summary judgment, upon motion, against a party who fails to make a showing sufficient to establish an element essential to his case on which he bears the burden of proof at trial." Schechter v. Ga. State Univ., 341 F. App'x 560, 562 (11th Cir. 2009) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)).

## III. LEGAL FRAMEWORK[7]

### A. ERISA Retaliation Claim

Section 510 of ERISA provides:

> It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan . . . or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan . . . .

---

[7] Marx raises an argument about why he need not establish comparators to prove his prima facie case. (Doc. 34 at 17). It is unclear whether this is because he cut and paste this section from another brief or some other reason, but comparators are not part of the prima facie case for ERISA or FMLA.

29 U.S.C. § 1140. A plaintiff bringing an action under § 510 must show that the employer had the "specific intent to interfere with the employee's right to benefits." Reynolds v. Int'l Bus. Machines Corp., 320 F. Supp. 2d 1290, 1298-99 (M.D. Fla.) (quoting Seaman v. Arvida Realty Sales, 985 F.2d 543, 546 (11th Cir. 1993), aff'd sub nom. Reynolds v. IBM, 125 F. App'x 982 (11th Cir. 2004)). "This standard does not require the plaintiff to show that interference with ERISA rights was the sole reason for discharge but does require plaintiff to show more than the incidental loss of benefits as a result of a discharge." Id. "This burden can be met either by showing direct proof of discrimination or by satisfying the scheme for circumstantial evidence established by McDonnell Douglas [Corp. v. Green, 411 U.S. 792 (1973)]." Id. (quoting Clark v. Coats & Clark, Inc., 990 F.2d 1217, 1223 (11th Cir. 1993)). Under this framework, the plaintiff first "must establish a prima facie case of discrimination." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000).

Thus, "in the context of a § 510 claim alleging unlawful discharge, [Marx] may establish a prima facie case of discrimination by showing (1) that he is entitled to ERISA's protection, (2) was qualified for the position, and (3) was discharged under circumstances that give rise to an inference of discrimination." Clark, 990 F.2d at 1223. While Marx must show that Defendants' "decision was directed at ERISA rights in particular [,]" id. at 1224, the general rule is that "close temporal proximity between the employee's

protected conduct and the adverse employment action is sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection." Brungart v. BellSouth Telecomms., Inc., 231 F.3d 791, 799 (11th Cir. 2000); Kinkead v. Southwestern Bell Tel. Co., 49 F.3d 454, 456 (8th Cir. 1995) ("This connection may be based upon circumstantial evidence regarding the employer's intent, such as proof that a discharge followed an exercise of protected rights so closely in time as to justify an inference of retaliatory motive.").

If the plaintiff successfully establishes the prima facie case, a presumption is created "that the employer unlawfully discriminated against the employee." Chapman v. AI Transport, 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc).

> If a plaintiff establishes a prima facie case of discrimination, the defendant employer must articulate a legitimate, nondiscriminatory reason for the challenged employment action. However, the employer's burden is merely one of production; it need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff . . . . If the defendant articulates one or more such reasons, the presumption of discrimination is eliminated and the plaintiff has the opportunity to come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision. If the plaintiff does not

> proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment on the plaintiff's claim.

Id.

## B. FMLA Retaliation Claim

The FMLA grants eligible employees the right to "12 workweeks of leave during any 12–month period . . . [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee," 29 U.S.C. § 2612(a)(1), and the right following leave "to be restored by the employer to the position of employment held by the employee when the leave commenced" or to an equivalent position, 29 U.S.C. § 2614(a)(1). Strickland v. Water Works & Sewer Bd. of City of Birmingham, 239 F.3d 1199, 1206-07 (11th Cir. 2001). To preserve these rights, the FMLA creates two types of claims: interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the FMLA, see 29 U.S.C. § 2615(a)(1), and retaliation claims, in which an employee asserts that his employer discriminated against him because he engaged in activity protected by the FMLA, see 29 U.S.C. § 2615(a)(1) & (2); 29 C.F.R. § 825.220(c) ("An employer is prohibited from discriminating against employees . . . who have used FMLA leave."). Id.

Here, Marx has brought only a retaliation claim against Defendants. Thus, to succeed on this claim, Marx must demonstrate that Defendants intentionally discriminated against him in the form of an adverse employment action for having exercised an FMLA right. Id. In other words, Marx faces the increased burden of showing that his employer's actions "were motivated by an impermissible retaliatory or discriminatory animus." Id.

Absent direct evidence of the defendant's intent, courts evaluate FMLA retaliation claims under the burden-shifting framework set forth in McDonnell Douglas. Rudy v. Walter Coke, Inc., 613 F. App'x 828, 830 (11th Cir. 2015). Because Marx has put forth no direct evidence of retaliation, the Court must employ McDonnell Douglas.[8] Under this framework, Marx must first establish a prima facie case of FMLA retaliation. Id.

"To establish a prima facie case of FMLA retaliation, the plaintiff must show that (1) he engaged in statutorily protected conduct, (2) he suffered a materially adverse action, and (3) the adverse action was causally related to the protected conduct." Id. The plaintiff may satisfy the causal connection element by showing that the protected activity and adverse action were "not wholly unrelated." Id. Generally, an employee can establish that these events were not

---

[8] Marx does not argue that he has produced direct evidence of his claims; instead he relies on a mosaic of circumstantial evidence to survive summary judgment. (See, e.g., Doc. 34 at 16-17).

wholly unrelated by showing that the decisionmaker was aware of the protected conduct at the time of the adverse action. Id. "Close temporal proximity between protected conduct and an adverse employment action is generally 'sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection.'" Hurlbert v. St. Mary's Health Care Sys., Inc., 439 F.3d 1286, 1298 (11th Cir. 2006) (quoting Brungart, 231 F.3d at 799).

If Marx is able to present a prima facie case, the burden shifts to Defendants to articulate a legitimate, non-discriminatory reason for the adverse action. Id. Once Defendants present a legitimate, nondiscriminatory reason, the burden shifts back to Marx to show that Defendants' purported reason was simply a pretext for discrimination. Id. Because the standards and the evidence for evaluating Marx's ERISA and FMLA claims overlap significantly, the Court will analyze them together.

## C.    Convincing Mosaic Framework

Even if a plaintiff's case fails under the McDonnell Douglas framework, he will still survive summary judgment if he provides "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." Smith v. Lockheed–Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011) (citations omitted). The fundamental question then remains whether the plaintiff has presented circumstantial evidence sufficient to raise a reasonable inference of intentional discrimination.

18

Hamilton v. Southland Christian Sch., Inc., 680 F.3d 1316, 1320 (11th Cir. 2012).

## IV. ANALYSIS

### A. McDonnell Douglas Framework

#### 1. Prima Facie Case

Defendants do not dispute that Marx has established the first two prongs of his prima facie case under the ERISA and FMLA standards. However, Defendants contend that Marx has failed to establish the third elements: termination under circumstances giving rise to an inference of discrimination under ERISA, and a causal connection between the protected activity and the adverse action under the FMLA.

It is undisputed that Markos was aware of the protected conduct (requesting knee surgery) at the time of the adverse action (terminating Marx).[9] However, Defendants argue that on April 10, 2013—a date between the Markos/Marx meeting regarding knee surgery and Marx's termination—Waller

---

[9] Markos disputes that Marx specifically requested knee surgery at the April meeting. (Doc. 33 at 17; Markos Dep. 80:20-81:23, 88:10-13). And, even if Marx requested surgery, he did not formally request FMLA leave, as Marx testified at his deposition that he was unaware of his rights under the FMLA until later when he worked at a position in Flagler. (Marx Dep. 49:14-50:8, 151:3-20). However, the record shows that Markos knew about Marx's knee ailments for years, including the year preceding Marx's termination. (Markos Dep. 68:7-69:22, 82:13-85:20). As such, viewing the evidence in the light most favorable to Marx, he has satisfied his prima facie burden on this element.

brought his concerns regarding Marx's performance on the Meditech conversion to Markos, which constitutes intervening conduct sufficient to break the causal connection between Marx's protected conduct and his termination. (Markos Decl., Doc. 33-7 ¶ 4). Although Defendants correctly note that "[i]ntervening acts of misconduct can break any causal link between the protected conduct and the adverse employment action," Henderson v. FedEx Express, 442 F. App'x 502, 506 (11th Cir. 2011), the conduct at issue—while undeniably related to Marx—was not precisely Marx's; rather, it was Waller's actions in bringing his apprehensions to Markos which Defendants argue broke the causal chain. Given that the Eleventh Circuit has found that "[t]he burden of causation can be met by showing close temporal proximity between the statutorily protected activity and the adverse employment action," Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007), at the prima facie stage, Defendants' argument regarding intervening conduct is unavailing.[10]

While "mere temporal proximity," without more, "must be very close," Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001), the nearly two-week interval between Marx's meeting with Markos and his termination is sufficient at the prima facie stage. See Henderson, 442 F. App'x at 507 (events occurring only two weeks apart normally give rise to an inference of causation).

---

[10] Notably, even Defendants concede that "Plaintiff's actual 'conduct' was not intervening in the literal sense." (Doc. 33 at 21).

And although Defendants attempt to show that Marx's unprofessional conduct in connection with the Meditech conversion severely weakens the causal connection, (Doc. 33 at 20-21), when viewing the evidence in the light most favorable to Marx, the Court finds that Marx has (barely) stated a prima facie case under the ERISA and FMLA frameworks.

## 2.    **Defendants' Legitimate, Non-Retaliatory Reason**

Defendants have met their burden to produce legitimate, non-retaliatory reasons for Marx's termination. See Chapman, 229 F.3d at 1024 ("[T]he employer's burden is merely one of production; it 'need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff.'" (quoting Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997))). Defendants assert that Marx was fired because of his failure to timely and properly implement the Meditech electronic health records conversion in the respiratory department and his generally negative attitude toward the project. (Doc. 33 at 22). Based on these facts and that Marx's performance could have cost BCMS at least $1 million in meaningful use reimbursement, Markos determined that Marx should be terminated. Because Defendants have presented a legitimate, nondiscriminatory reason for terminating Marx, the burden shifts back to Marx to show that Defendants' purported reason was simply a pretext for retaliation.

### 3. Pretext

Marx argues that Defendants' proffered reason for terminating him is pretextual, and that he was terminated in retaliation for exercising his ERISA and FMLA rights. To show pretext, Marx must "come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." Jones v. Gulf Coast Health Care of Del., LLC, 854 F.3d 1261, 1274 (11th Cir. 2017) (citation omitted). Marx cannot show that Defendants' proffered reasons for terminating him were pretextual simply by "quarreling with the wisdom" of those reasons. Id. (citing Brooks v. Cty. Comm'n of Jefferson Cty., 446 F.3d 1160, 1163 (11th Cir. 2006)). He may, however, establish pretext by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." Id. (citing Combs, 106 F.3d at 1538).

In the absence of direct evidence of retaliation, Marx's response essentially blends the McDonnell Douglas and circumstantial mosaic frameworks and identifies a host of disconnected, largely irrelevant evidence to

show pretext.[11] However, the Court begins with what is arguably Marx's strongest evidence—the timing of his meeting with Markos in which Marx states that he requested leave for knee surgery. The evidence shows that only approximately two weeks separated this meeting and Marx's termination. While "it is true that temporal proximity can be sufficient to establish a prima facie case of retaliation," where the prima facie case has been successfully rebutted (as here), the temporal closeness between the protected activity and the adverse action is insufficient on its own to sustain a finding of pretext. Coleman v. Ala. State Univ., 904 F. Supp. 2d 1245, 1256 (M.D. Ala. 2012); see also Hurlbert, 439 F.3d at 1298 ("The close temporal proximity between Hurlbert's request for leave and his termination—no more than two weeks, under the broadest reading of the facts—is evidence of pretext, though probably insufficient to establish pretext by itself.") (citing Wascura v. City of South Miami, 257 F.3d 1238, 1244–45 (11th Cir.2001) (holding that three and one-half month period between employee's protected activity and her termination was, standing alone, insufficient to establish pretext)). At the meeting, Markos told

---

[11] For example, in the statement of facts in his response, Marx discusses a 340B drug program and a laboratory situation at BCMS which he speculates were improper. (Doc. 34 at 4-5). These instances have nothing to do with the pertinent issues in this case, with the latter occurring after Marx's termination. (Martin Dep. 11-17). Moreover, Marx does not cite these issues as evidence of pretext in the argument section of his response, further demonstrating their irrelevance. Therefore, these pieces of evidence fail to support Marx's claims, and the Court declines to address them further.

Marx he would look into Marx's leave request and get back to him in two weeks. Marx provides no evidence that Markos objected to him taking leave for surgery or that the request motivated the termination. To the contrary, the record reflects that Markos routinely allowed Marx to take leave for numerous surgeries during his tenure with BCMS.

The undisputed evidence shows that on April 10, 2013, after Marx requested surgery and two days before his termination, Waller met with Markos and voiced his disapproval regarding Marx's performance on the project. (Waller Dep. 282:16-284:6, 372:9-17). The same day, Waller submitted to Markos a memorandum entitled "Overall Evaluation of the Respiratory Preparation and Execution of Phase I: Respiratory Directors [sic] Performance," which noted that Marx was "disruptive and negative" at Meditech training; declined ITS onsite training; was talking and not listening according to other users in the training classes; stated that he had not been trained, despite receiving more help than any other department; had not taken a leadership role in getting his equipment interfaced with Meditech; and had to back pedal and do the respiratory department's charges in ITS, which should have been done much earlier. (Doc. 33-7 at 4-5, Waller Memo.). In addition, Marx's staff approached Waller and expressed their confusion about the Meditech conversion, stating that they had "no idea what to do." (Id.). Waller had spoken with Marx about Marx's poor leadership of the respiratory department during

the Meditech conversion. Despite the informal warning, Marx failed to take ownership and responsibility for the Phase I implementation in respiratory and "left his department totally frustrated." (Id.). Marx simply showed "no signs of improvement," "as if [Marx and Waller] had no discussions." (Id.). Waller opined that Phase II would not go any better with Marx at the helm of the respiratory department, and implementation of Phase II "will have the same result if [Marx] stay[ed] at the lead position . . . for his department, in addition to the final depletion of any morale left within his staff." (Id.).

After conferring with Waller and reading his memo, Markos sought other BCMS employees' feedback about Marx's work on the Meditech project "to see if [he] had grounds to terminate, to justifiably terminate [Marx]." (Markos Dep. 125:7-22). The respiratory department was "the one that was behind. . . . All the other departments were up to snuff." (Markos Dep. 125:25-126:3). Markos also obtained post-termination memoranda describing Marx's performance which memorialized the pre-termination discussions between Markos and the other BCMS employees. (Doc. 33-7 at 12-15; Markos Dep. 125:7-12).

For example, Ms. Markos observed that over the course of the Meditech project, "there have been several issues with Kim Marx and his not understanding or willing to be instructed on the actual steps necessary to make his department work." (Doc. 33-7 at 12). She noted that although Marx received ample assistance on the project from the nursing staff, he repeatedly stated that

he did not know how to perform certain tasks and "nobody ever showed him what to do." In addition, Ms. Markos recalled that "after [the Meditech system] went live, . . . none of his staff had been trained on how to use the system to place charges and complete orders."

Clarice Nazworth, a member of the core team on the Meditech project and a chart auditor, also provided Markos with a memorandum on Marx's performance on the Meditech conversion. (Doc. 33-7 at 13-14).[12] She noted that "Marx never showed up in the training room." When Marx "failed to build his part, he asked if [Nazworth] would do this for him," and she built his department's orders in the OM module. According to Nazworth, Marx "was not interested in helping with the [OM] build." He complained that no one would help him learn how to work the system, which Nazworth stated was incorrect; she notes that she "was tired of [Marx] saying no one would help him when [she] had helped him . . . for hours." On April 8, 2013, Nazworth met with Ms. Markos to communicate her concerns regarding the respiratory department's lack of consistency and issues with placing orders in the computer system. On April 11

---

[12] Markos testified that he did not speak with Nazworth directly, but "it got out through nursing, through Mrs. Markos, that [he] wanted anecdotal information written down about anything negative concerning the computer implementation and their interactions with Mr. Marx." (Markos Dep. 125:7-18).

and 12, 2013, Nazworth called "RT"[13] and spoke with Lee regarding incomplete orders.

In addition to Ms. Markos and Nazworth's memoranda, Jeremy Sands, a registered nurse, also wrote a memorandum on April 15, 2013, which noted that he personally offered, assisted, and worked with the respiratory department multiple times to help it achieve the Meditech project's goals. (Doc. 33-7 at 15).

On April 12, 2013, after obtaining input from BCMS employees, Markos terminated Marx for his failure to timely implement the Meditech software in the respiratory department and his "obstructionistic, negative" approach to the project. (Markos Dep. 114:1-115:3, 124:22-126:9, 155:13-19, 161:10-25). While Markos may not have been crystal clear in offering reasons for termination at the time he fired Marx, he mentioned that it related to Marx's computer and problems in the respiratory department. See supra at p. 11. According to Markos, the Meditech project was nearing the meaningful use deadline, and Marx's untimely, poor performance could have cost the hospital approximately $1 million. (Markos Dep. 111:19-112:19). Markos testified that Marx's failure to complete an assignment which could cost BCMS such a large sum fell within the personnel policy of "detrimental to the organization," allowing Markos to terminate him immediately, without progressive discipline. (Markos Dep.

---

[13] Presumably, RT means respiratory therapy.

133:10-17, 139:4-9). While Marx argues that Markos failed to adequately explain the reasons for his termination at the April 12, 2013 meeting, in the email that Marx sent Markos in December 2013, months following his termination, Marx acknowledged that his termination had to do with his "lack of computer skills."[14] (Doc. 33-7 at 16).

Other than the temporal proximity between their meeting in which he requested leave and his termination—insufficient on its own to show pretext—Marx has simply not presented a genuine issue of material fact that Markos fired him for any reason other than Marx's subpar performance in attempting to lead the respiratory department through the Meditech conversion. In the Eleventh Circuit, the court does not "sit as a 'super-personnel department,' and it is not [the court's] role to second-guess the wisdom of an employer's business decisions—indeed the wisdom of them is irrelevant—as long as those decisions were not made with a discriminatory motive." Alvarez v. Royal Atl. Developers, Inc., 610 F.3d 1253, 1266 (11th Cir. 2010) (citing Chapman, 229 F.3d at 1030). That is true "[n]o matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers."

---

[14] This 2013 email undermines Marx's letter to Markos in February 2015, which expresses confusion as to the reasons for his termination. (Doc. 34-4) ("After almost two years I don't really know what happened. When I was informed of my termination all I got was 'I have talked to people in and outside of you [sic] department and I think you should leave now.' . . . I respectfully request some detail so I can understand why my employment was terminated.").

Id. (quotation marks and citations omitted). Accordingly, the temporal proximity between the protected activity and the termination, standing alone, is insufficient evidence of pretext.

Marx also argues that Markos's "hostility" toward employees' health claims is evidence of pretext. Marx identifies various statements which he argues "reflect [Markos's] belief that the premiums paid by employees into self-insured [sic] health insurance plan at BCMS, is [sic] his money." (Doc. 34 at 4) (citing Marx Dep. 61:3-16, 66-67, 93-96, 100-104; Marx Aff. ¶ 26). In addition, Marx asserts that Markos's ability to monitor insurance claims and prescriptions, access to BCMS's medical records, and authority to direct the TPA to not pay a health claim constitute evidence that he was terminated in retaliation for exercising his statutory rights. (Doc. 34 at 4). However, Marx fails to cite any evidence that Markos was actually monitoring the claims he and his wife made under the Plan, that Markos exhibited resentment regarding their claims,[15] or that he denied any such claims. In fact, the evidence shows that Marx and his wife underwent numerous expensive procedures over the years, all of which were covered by the Plan, and none of which resulted in any adverse employment action against Marx. Martin testified that Markos would only get involved with health claims if an employee sought him out or she did

---

[15] The Court will discuss Markos's treatment of Ms. Marx's claim following her slip and fall infra.

on an employee's behalf. (Martin Dep. 33:17-34:4, 36:18-37:8). In addition, Marx testified that he had no knowledge of Markos denying any claim that an employee or covered person submitted to BCMS. (Marx Dep. 249:3-250:4). Markos could not recall a single instance where someone at BCMS received a claim from the TPA and decided it should not be paid. (Markos Dep. 34:10-14). Given the foregoing, even if Markos was monitoring or aware of employees' claims, it is mere speculation that Markos terminated Marx because of his impending use of the Plan and need to take FMLA leave for knee surgery.[16]

Similarly, Marx argues that Markos demonstrated "specific hostility towards Mr. Marx regarding his wife's prior claims." (Doc. 34 at 19). While the evidence reflects that Markos was involved in the delay in paying Ms. Marx's claim for her hand surgery, he only became involved following Marx's unsolicited suggestion that Markos postpone paying the bill because St. Vincent's might be liable in tort. Further, even after the delay, while Marx

---

[16] To the extent Marx argues "[t]here are questions of fact as to Markos and BCMS [sic] direct involvement in determining coverage under the self-insurance plan for procedures which were to be performed at BCMS" (Doc. 34 at 11), the Court disagrees that this creates a genuine issue of material fact which would preclude summary judgment. While there is conflicting evidence regarding whether Markos overrode a denial of a claim so that Marx could have neck surgery faster—which could seemingly only help Marx—this conflicting evidence is peripheral and does not create a genuine issue of material fact regarding the pertinent issue in this case: whether Markos fired Marx because he needed knee surgery. Marx presents no evidence that Markos ever overrode a TPA approval of any BCMS employee's claim, much less one of his own.

determined whether to sue St. Vincent's and conferred with Markos and BCMS's attorney, Ms. Marx's bill was eventually paid in full. Although Marx believes that the controversy surrounding payment of the bill affected his relationship with Markos, Marx presents no evidence that Markos harbored a grudge against him following the incident. To the contrary, Marx underwent additional medical procedures, such as two cardiac catheterizations and a stent procedure, following the slip and fall which were covered by the Plan, with no interference from Markos regarding payment or otherwise.

Moreover, the events surrounding the slip and fall occurred in 2011, approximately eighteen months prior to Marx's termination in April 2013. As such, in addition to the foregoing reasons, these events are too remote to constitute evidence of pretext. See Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1092 (11th Cir. 2004) (finding denial of promotion in November 1999 and termination in February 2001 were too remote to allow a reasonable inference of sex discrimination, despite evidence of a contentious relationship, because no evidence of a connection between the two events or that the termination was based on sex was provided).

Marx also raises several issues with the implementation and mismanagement of the Meditech project, from its timing to a lack of direction from Waller to a lack of professional talent on site. (Doc. 34 at 12-16; Doc. 39 at 2-5). Regardless of whether Marx felt the Meditech project could have been

handled in a more professional or efficient way, he fails to meet Defendants' reason for terminating him "head on and rebut it." Chapman, 229 F.3d at 1030. Marx's failure to meet a clearly established deadline which risked costing BCMS at least $1 million was a legitimate reason to terminate him. Simply because the constraints of the project in terms of tight deadlines and limited support inhibited Marx's ability to timely complete his task does not undermine Markos's reason for firing him upon learning of his negative attitude and inability to meet the Phase I deadline. The Eleventh Circuit has reiterated that an "employee cannot succeed by simply quarreling with the wisdom" of an employer's reason for termination. Id. What matters is not what Marx actually did or said or what he believed, but only what Markos, the decisionmaker, reasonably concluded he did or said. See Bruce v. Sam's E., Inc., No. 4:11CV636-RH/CAS, 2012 WL 6733034, at *3 (N.D. Fla. Dec. 28, 2012). "As the Eleventh Circuit has recognized time and again, '[t]he employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory [or retaliatory] reason.'" Id. (citing Nix v. WLCY Radio/Rahall Commc'ns, 728 F.2d 1181, 1187 (11th Cir. 1984) (Wisdom, J.) (collecting earlier authorities)). Marx has not presented "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in Defendants' explanation for his termination sufficient to establish pretext. Jones, 854 F.3d at 1274.

## B. Convincing Mosaic Framework

Although Marx contends he has presented a convincing mosaic of evidence such that his case should survive summary judgment, he has failed to meet this burden. <u>See</u> <u>Hayes v. Deluxe Mfg. Operations LLC</u>, No. 116CV02056RWSRGV, 2018 WL 1461690, at *22, n.38 (N.D. Ga. Jan. 9, 2018) (finding "no convincing mosaic of circumstantial evidence giving rise to an inference of [retaliation]") (citing <u>Stevens v. City of Forest Park</u>, 635 F. App'x 690, 701 n.13 (11th Cir. 2015) (per curiam) (unpublished), <u>report and recommendation adopted</u>, No. 1:16-CV-2056-RWS, 2018 WL 1869825 (N.D. Ga. Feb. 21, 2018)). Rather, he has assembled an assortment of facts about the Plan and Markos's role in its administration, his disagreement with Markos regarding Ms. Marx's medical bill, which was ultimately paid, and his frustration with the Meditech project. However, none of the evidence adduced gives rise to an inference of retaliation. Instead, "most of the evidentiary tiles he proffers were discarded as insufficient or irrelevant in considering his other arguments against summary judgment. These tiles cannot now be reassembled to create a convincing mosaic of [retaliatory] intent." <u>Flowers v. Troup Cty., Ga., Sch. Dist.</u>, 1 F. Supp. 3d 1363, 1381 (N.D. Ga. 2014), (citation omitted), <u>aff'd</u>, 803 F.3d 1327 (11th Cir. 2015). Even after drawing all reasonable inferences in Marx's favor, no reasonable jury could conclude that he was fired for exercising his rights under ERISA or the FMLA.

Accordingly, it is hereby

**ORDERED:**

1.      Defendants' Dispositive Motion for Summary Judgment (Doc. 33) is **GRANTED**.

2.      The Clerk shall enter judgment in favor of Defendant Baker County Medical Services, Inc., d/b/a Ed Fraser Memorial Hospital and Defendant Dennis Markos and against Plaintiff Kim Marx.

3.      Once judgment has been entered, the Clerk shall terminate all deadlines and pending motions, and close the file.

**DONE AND ORDERED** in Jacksonville, Florida the 5th day of September, 2018.


TIMOTHY J. CORRIGAN
United States District Judge

sj
Copies:

Counsel of record